In re ) Case No. _____
)
) NOTICE OF *PRELIMINARY*
) HEARING ON MOTION
)     FOR USE OF CASH COLLATERAL
)     TO OBTAIN CREDIT
Debtor(s) ) *(Check One)*

YOU ARE NOTIFIED THAT:

1.    The undersigned moving party, _____, filed a Motion     For Use of Cash Collateral     To Obtain Credit *(check one)*. A copy of the motion is attached; and it includes (i) the statement required by Local Form #541.5, and (ii) the following allegations:

a.  The immediate and irreparable harm that will come to the estate pending a final hearing is _____ _____.

b.  The amount of    cash collateral    credit *(check one)* necessary to avoid the harm detailed above prior to the final hearing is _____.

2.    The name and service address of the moving party's attorney (or moving party, if no attorney) are: _____.

3.    A *PRELIMINARY* HEARING on the motion WILL BE HELD ON _____ AT _____ IN _____. Testimony will be received if offered and admissible.

4.    If you wish to object to the motion, you must do one or both of the following: (1) attend the preliminary hearing; and/or (2) file with the Clerk of Court (i.e., if the 5-digit portion of the Case No. begins with "3" or "4", mail to 1001 SW 5th Ave #700, Portland OR 97204; OR if it begins with "6" or "7", mail to 405 E 8th Ave #2600, Eugene OR 97401), a written response, which states the facts upon which you will rely and, if the response is filed within three business days before the hearing, notify the judge's chambers immediately after filing the document, as required by LBR 9004-1(b).

5.    On _____ copies of  this notice  and the motion were served pursuant to FRBP 7004 on the debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee elected pursuant to 11 U.S.C. §705; any creditors' committee chairperson [or, if none serving, on all creditors listed on the list filed pursuant to FRBP 1007(d)]; any creditors' committee attorney; the U.S. Trustee; and all affected lien holders whose names and addresses used for service are as follows:

_____
Signature of Moving Party or Attorney                                    OSB #
_____
(If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541.1 (6/1/15)

**Timothy J. Conway**, OSB No. 851752 (Lead Attorney)
    Direct Dial:   (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
**Ava L. Schoen**, OSB No. 044072
    Direct Dial:   (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:      ava.schoen@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR 97204

      Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 16-32311-pcm11 |
| Peak Web LLC, | **DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION LOAN)** |
| Debtor. | |
| | *EXPEDITED HEARING REQUESTED* |

Pursuant to 11 § U.S.C. § 364(d)(1) and Bankruptcy Rule 4001 (c), Peak Web

LLC, dba Peak Hosting, debtor and debtor in possession ("Peak" or "Debtor"), moves this

Court for interim and final orders authorizing it to obtain first priority secured credit for the

purposes and on the terms set forth herein. In support of its motion Debtor incorporates the

statements contained in the Declaration of Mark Calvert of Cascade Capital Group in

Support of Debtor's First Day Motions ("First Day Declaration") filed contemporaneously

herewith, and further states as follows:

       1.     On June 13, 2016 (the "Petition Date"), Debtor filed a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code.

       2.     Debtor has continued in possession of its property and continues to

**Page 1 of 11** -   DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
            DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
            LOAN)

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-32311-pcm11   Doc 14   Filed 06/13/16

operate and manage its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory bases for the relief requested by this Motion are Sections 364(b) of Chapter 11 of Title 11 of the United States Code and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure.

6.     No request has been made for the appointment of a trustee or examiner, and an official committee has not yet been established in this case.

7.     Debtor is a managed service company that provides the servers, storage, network, datacenter, and staff for some of the largest online businesses.  Peak Hosting is essentially a "cloud" service provider for companies who do not want to build out an operations department to run all of these elements themselves.

8.     As more fully described in paragraphs 9 through 14 of the First Day Declaration and paragraphs 8 through 15 of the Application to Employ Susman Godfrey LLP as Special Purpose Counsel ("Susman Godfrey Application"), Debtor is presently involved in litigation with Machine Zone, Inc. ("Machine Zone") entitled *Peak Web, LLC v. Machine Zone, Inc, et al*, No. 1-15-cv-288681 (Cal. Supp. Court, Santa Clara Cty.) and any related action, as well as defense claims asserted against Debtor by *Machine Zone, Inc. v. Peak Web, LLC*, No. 1-15-cv-288498 (Cal. Supp. Court, Santa Clark Cty.) and any related actions (collectively, the "Litigation").  Prior to the Petition Date, Debtor employed the firm of Susman Godfrey, LLP ("Susman Godfrey") to more aggressively represent it in the Litigation.  A copy of the Susman Godfrey engagement letter is attached to the Susman

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   Godfrey Application as Exhibit 1.  Pursuant to the terms of engagement with Susman

2   Godfrey, Debtor was immediately required to deposit the sum of $50,000 for costs and

3   expenses.  An additional $150,000 is due on or before June 30, 2016.  Debtor and Susman

4   Godfrey believe that a total of approximately $1.5 million will be needed to cover costs and

5   expenses of the Litigation prior to the scheduled March 2017 trial date.

6           9.      Peak does not have sufficient funds from operations to fund the costs

7   of the Litigation.  Consequently, prior to the Petition Date, Peak entered into a loan and

8   security agreement with PSA 9, LLC ("PSA 9") to fund the expenses associated with the

9   Litigation.  PSA 9 advanced the initial $50,000 required under the terms of the engagement

10  with Susman Godfrey and has agreed to advance the additional costs and expenses as

11  necessary.  PSA 9 requires that it have a first priority perfected lien position on the Litigation

12  and proceeds thereof.  PSA 9 is an affiliate of the entity that owns a 20% interest in Debtor.

13          10.     Debtor seeks authorization to approving the borrowing of up to

14  $1.5 million from PSA 9 (the "Litigation Lender") subject to and in accordance with the

15  terms and conditions set forth in Peak Web LLC Loan and Security Agreement ("Litigation

16  Loan") and, together with the other documents entered into in connection therewith, (the

17  "Litigation Loan Documents") entered into by Debtor and Litigation Lender. By this motion,

18  Debtor seeks entry of (i) an interim order in the form attached hereto as Exhibit 1 (the

19  "Interim Order") (A) authorizing it to borrow on an interim basis the amount of $150,000,

20  which is the amount necessary pending a final hearing; and (B) scheduling a final hearing on

21  this motion, and (ii) a final order (the "Final Order") authorizing it to borrow, on a final basis,

22  the aggregate principal amount of $1.5 million in accordance with the terms and conditions

23  set forth in the Litigation Loan Documents.  A copy of the Litigation Loan Documents is

24  attached to the proposed Interim Order as Exhibit 1.

25          11.     In connection with the postpetition financing to be made available to

26  Debtor under the Litigation Loan Documents, Debtor requests authority to do the following:

**Page 3 of 11 -**   DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
                DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
                LOAN)

1     a.  Subject to the terms and limitations set forth in the Litigation

2 Loan Documents, Interim Order and Final Order, to grant to Litigation Lender, pursuant to

3 Section 364(d)(1) of the Bankruptcy Code, a perfected, first-priority, senior lien on the

4 Litigation, as set forth in the Litigation Loan Documents, whenever acquired (the

5 "Collateral"), with such liens to prime and be senior in priority to all existing security

6 interests in and liens on the Litigation and proceeds thereof;

7     b.  To grant adequate protection to those creditors whose interests

8 will be affected by the proposed Litigation Loan (as identified in paragraph 12 below and

9 collectively referred to herein as the "Existing Secured Creditors" and the liens of the

10 Existing Secured Creditors referred to as the "Existing Liens"); and

11     c.  To modify the automatic stay under Section 362 of the

12 Bankruptcy Code to the extent necessary to implement the transactions contemplated hereby.

13    12.  The following creditors have or may claim to have a security interest

14 in or lien on property of the estate that will be affected by the "priming" lien to be granted to

15 Litigation Lender:

16     a.  Bank of the West ("BOTW"), asserts a perfected security

17 interest and lien in substantially all of Debtor's assets including inventory, equipment,

18 accounts, chattel paper, instruments, general intangibles, and other items more specifically

19 set forth in a series of loan documents and security agreements, as more particularly

20 described in Debtor's Motion for Temporary and Final Authority to Use Cash Collateral.  It is

21 expected that BOTW will support and consent to the Litigation Loan and priming lien.

22     b.  Data Sales, which has an avoidable security interest in the

23 Litigation proceeds, pursuant to an amendment to equipment schedules dated April 1, 2016

24 and financing statement filed in California on March 29, 2016, to secure lease obligation,

25 which lien Debtor intends to avoid by stipulation or order of this Court.

26

**Page 4 of 11** - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
     DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
     LOAN)

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    c.    Collins Technology Park Partners, LLC, which has an

2    avoidable security interest in the Litigation proceeds, pursuant to an Agreement Terminating

3    Leases dated on or about March 18, 2016, and a financing statement filed in California on

4    March 25, 2016, which lien Debtor intends to avoid by stipulation or order of this Court.

5          d.    Capital Community Bank, which has an avoidable security

6    interest in the Litigation proceeds pursuant to a Change in Term Agreement dated April 1,

7    2016, and a financing statement filed in Oregon on May 17, 2016, to secure amounts owing

8    under an equipment loan, which lien Debtor intends to avoid by stipulation or order of this

9    Court.

10         13.    In accordance with Bankruptcy Rule 4001(c)(1)(B) and the Court's

11   Guidelines Regarding Motions to Obtain Credit set forth in LBF 541.7, the following is a

12   summary of the provisions described in those rules that are included in the Litigation Loan

13   Documents, the Interim Order, and the Final Order:

14         a.    Provisions Regarding Priming Liens Without the Consent of

15   Lienholders.  The Litigation Loan will be secured by priming liens on the Collateral to which

16   the Existing Secured Creditors may or may not have consented to pursuant to section

17   364(d)(1) of the Bankruptcy Code.  It is expected that BOTW will consent to the priming

18   lien.  The Existing Liens of the other Existing Secured Creditors are invalid, avoidable as

19   preferences under 11 U.S.C. § 547, or otherwise voidable.  In any event, the Interim Order

20   and Final Order will provide for adequate protection of whatever interest Existing Secured

21   Creditors may have in the Collateral.

22         b.    Replacement Liens as Adequate Protection of Existing Liens.

23   As adequate protection for the Existing Liens, to the extent they remain viable and pending

24   avoidance under the Bankruptcy Code, or otherwise, the Existing Secured Creditors will

25   receive (i) Adequate Protection Liens on the Collateral, to the same extent, validity,

26   enforceability and relative priorities as their prepetition liens; provided, however, that such

**Page 5 of 11** -  DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
LOAN)

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Adequate Protection Liens will be junior to the liens granted to Litigation Lender to secure the Litigation Loan.

        c.    <u>Interest and Maturity Date</u>.  The interest rate under the Litigation Loan Documents is 15%.  The maturity date is June 30, 2017, which is one month after the scheduled trial date.

        d.    <u>Prepetition Advances</u>.  The initial advance required by the Litigation Loan Documents in the sum of $50,000 was made prior to the Petition Date.

        e.    <u>Remedies and Relief from Stay</u>.  Upon the occurrence of an Event of Default under and as defined in the Litigation Loan Documents, (i) the automatic stay will be deemed vacated and modified to the extent necessary to permit Litigation Lender to immediately (A) deliver a notice of an Event of Default, and (B) terminate or suspend any future advance, and (ii) after five business days' written notice (within which period Debtor may only dispute Litigation Lender's declaration of an Event of Default in the Bankruptcy Court on an expedited basis), the automatic stay of Section 362 of the Bankruptcy Code will terminate, without further order of the Court and without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting Litigation Lender to declare the principal of and accrued interest, fees and expenses constituting the Litigation Loan obligations to be due and payable.  Upon and after the occurrence of an Event of Default, except as provided in the preceding sentence, Litigation Lender will be required to file a motion seeking relief from the automatic stay (a "Stay Motion") to enforce any of its other rights or remedies.  The Stay Motion will be heard on no more than five days' notice and the only issue to be adjudicated on the Stay Motion will be whether an Event of Default occurred under the Litigation Loan Documents.  Debtor will waive any right to enjoin the exercise of the rights and remedies by Litigation Lender following an Event of Default.

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1       14.     Debtor anticipates that from the Petition Date through trial, it will be

2    required to spend approximately $1.5 million to pursue the Litigation.  Over that period,

3    Debtor projects that it will need all of its operating cash to support ongoing operations.

4    Without additional funding, Debtor will not have the ability to fund the Litigation.  Debtor's

5    claims against Machine Zone are approximately $100 million.  Absent authority to obtain the

6    needed financing, Debtor will not be able to continue to pursue the Litigation, which will

7    result in significant loss of likely value to the estate and irreparable harm to creditors and all

8    parties in interest.

9       15.     Debtor was unable to obtain the needed financing from any source

10   other than Litigation Lender on the terms set forth in the Litigation Loan Documents either

11   on an unsecured basis undersection 364(b) or 364(c)(1) of the Bankruptcy Code or on a

12   secured basis under section 364(c)(3)of the Bankruptcy Code.  Despite Debtor's diligent

13   efforts to obtain the needed postpetition financing, only Litigation Lender has indicated an

14   ability and willingness to provide financing to Debtor.

15      16.     The Litigation Loan was negotiated at arms' length and included

16   negotiations between the parties, their representatives, and their respective counsel.  As a

17   result of these negotiations, the Litigation Loan Documents reflect a fair transaction.

18      17.     Under 11 U.S.C. § 364(d)(1), a court may authorize a debtor in

19   possession to obtain credit or incur debt secured by a senior or equal lien if "(A) the trustee is

20   unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of

21   the holder of the lien on the property of the estate on which such senior or equal lien is

22   proposed to be granted."

23      18.     To demonstrate that the requisite credit is not obtainable on more

24   favorable terms, a debtor need only demonstrate "by good faith effort that credit was not

25   available" without the protections afforded to potential lenders by section 364(d). *Bray v.*

26   *Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F2d 1085, 1088 (4th Cir

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before
concluding that such credit is unavailable." *Id.*; *see also In re Ames*, 115 BR at 40 (holding
that debtor made a reasonable effort to secure financing when it selected the least onerous
financing option from the two remaining lenders); *In re Reading Tube Indus.*, 72 BR 329,
332 (Bankr ED Pa 1987) ("Given the 'time is of the essence' nature of this type of financing,
we would not require this or any debtor to contact a seemingly infinite number of possible
lenders."). Where few lenders are likely to be able and willing to extend the necessary credit
to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such
an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 BR 107, 113 (Bankr ND Ga
1988).16. This threshold test is satisfied here. Debtor's senior management and its financial
advisors have explored various, alternative financing options, but have found no party willing
to advance sufficient credit on more favorable terms than Litigation Lender.

19. The Existing Secured Creditors are adequately protected. BOTW will
likely consent and will be protected by its junior lien and its cash collateral lien. The other
Existing Security Creditors' liens are avoidable as preferences or will maintain junior lien
positions. Moreover, if the Litigation Loan is not approved, Debtor will not be able to
effectively pursue the Litigation, which would mean all present liens in the Litigation would
be essentially worthless.

20. Section 361 of the Bankruptcy Code describes permissible means of
adequate protection. Under section 361, adequate protection may be provided by cash
payments, replacement liens, and other relief "as will result in the realization by such entity
of the indubitable equivalent of such entity's interest in such property." 11 USC § 361; *see*
*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 US 365, 369-73 (1988) (the
"interest in property" entitled to protection is "the value of the collateral" that secures the
claim). The legislative history of section 361 makes clear that bankruptcy courts are given

TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 broad flexibility in deciding what constitutes adequate protection on a case-by-case basis,

2 stating:

> 3 This section specifies the means by which adequate
> protection may be provided. It does not require the court to
> 4 provide it. To do so would place the court in an
> administrative role. Instead, the trustee or debtor-in-
> 5 possession will provide or propose a protection method. If
> the party that is affected by the proposed action objects, the
> 6 court will determine whether the protection provided is
> adequate. The purpose of this section is to illustrate means
> 7 by which it may be provided and to define the contours of
> the concept.

8

9 HR Rep No 95-595, at 338 (1977), reprinted in 1978 USCCAN 6295; *see also Resolution*

10 *Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F3d 552,

11 564 (3d Cir 1994) ("[A] determination of whether there is adequate protection is made on a

12 case by case basis."); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F2d 1393,

13 1396-97 (10th Cir 1987) (same); *Martin v. United States (In re Martin)*, 761 F2d 472, 474

14 (8th Cir 1985) (same); *accord FDIC v. Mathis (In re Mathis)*, 64 BR 279, 284 (ND Tex

15 1986) ("[T]he form of the adequate protection may vary on a case-by-case basis.").

16      21.      The interest to be protected by virtue of the adequate protection

17 requirement is the lesser of the value of the debt or the value of assets securing the debt. *See*

18 *In re Triplett*, 87 BR 25, 27 (Bankr WD Tex 1988) ("[U]nder the concept of adequate

19 protection — only the preservation of the value of the lien is required.") (*citing In re Alyucan*

20 *Interstate Corp.*, 12 BR 803, 808 (Bankr D Utah 1981)); *see also* 11 USC § 506.  Without the

21 new Litigation Loan, the value of the present liens could be $0.

22      22.      Where, as here, a debtor's use of debtor in possession financing

23 protects creditors from loss, the secured creditors are adequately protected without any need

24 for other forms of adequate protection.  *See, e.g., Orix Credit Alliance, Inc. v. Delta Res., Inc.*

25 *(In re Delta Res., Inc.)*, 54 F 3d 722, 730 (11th Cir 1995), cert denied, 516 US 980 (1995);

26

**Page 9 of 11** -   DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
LOAN)

*Westchase I Assocs. v. Lincoln Nat'l Life Ins. Co. (In re Westchase I Assocs. L.P.)*, 126 BR 692, 694 (WDNC 1991).

23.     Debtor's execution of the Litigation Loan Documents was a sound exercise of business judgment and was reasonable under the circumstances. Courts generally give broad deference to the business decisions of a debtor. See, .g., *Stephens Indus., Inc. v. McClung*, 789 F2d 386, 390 (6th Cir 1986); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F2d 1223, 1226 9 (5th Cir 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F2d 10 1063, 1070 (2d Cir 1983); *Walter v. Sonwest Bank (In re Walter)*, 83 BR 14, 19-20 (BAP 9th 11 Cir. 1987) (quoting *In re Cont'l*, 780 F2d at 1226). In particular, a bankruptcy court should defer to a debtor's reasonable business judgment regarding the need for funds so long as the proposed financing agreement does not contain terms that leverage the bankruptcy process or that benefit a third party rather than the bankruptcy estate. This was explained by the bankruptcy court in *In re Ames*:

> [A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest. 115 BR at 40.

24.     Here, Debtor's decision to enter into the Litigation Loan Documents represents a sound exercise of business judgment. Without financing, Debtor cannot adequately pursue the Litigation. If Debtor is unable to do so, it will lose its biggest asset and potential source of repayment to creditors. The Litigation Loan Documents address these problems by providing Debtor with the funding it needs to fund the Litigation.

25.     Notice of this motion has been given to, among other parties, (a) Bank of the West, (b) Data Sales, (c) Collins Technology Park Partners, LLC, (d) Capital Community Bank, (e) the U.S. Trustee, and (f) creditors holding the 20 largest unsecured

**Page 10 of 11** - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION LOAN)

1  claims.  Further notice is impractical in the circumstances.  Debtor submits that the foregoing

2  constitutes good and sufficient notice and that no other or further notice need be given in the

3  circumstances.

4          WHEREFORE, Debtor requests entry of an order granting the relief requested

5  herein and such other and further relief as is appropriate.

6          DATED this 13th day of June, 2016.

7

8                   TONKON TORP LLP

9

10                  By */s/ Timothy J. Conway*
                    Timothy J. Conway, OSB No. 851752

11                     Ava L. Schoen, OSB No. 044072
                   Attorneys for Debtor

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 11 of 11** - DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT (LITIGATION
LOAN)

# EXHIBIT 1

## PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 16-32311-pcm11 |
| Peak Web LLC, | **INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT AND SETTING FINAL HEARING (LITIGATION LOAN)** |
| Debtor. | |

THIS MATTER having come before the Court on June _____, 2016 upon

Debtor's Motion for Interim and Final Orders Authorizing Debtor to Obtain First Priority

Secured Credit (Litigation Loan) (the "Motion") [ECF No. _____]; notice of the Motion having

been given pursuant to Bankruptcy Rule 4001(c) and LBR 4001-1.D; and the Court having heard

and considered the arguments of counsel and all relevant pleadings, exhibits, and documents of

record in this case, and the representation of counsel at the time of hearing; now, therefore, the

Court hereby finds and concludes:

        A.      On June 13, 2016 (the "Petition Date"), Debtor filed its Voluntary Petition

for relief under Chapter 11 of Title 11 of the United States Code.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

B.      Debtor continues in possession of its property and is continuing to operate and manage its businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(b) and 1334, and these are core proceedings pursuant to 28 U.S.C. § 157(b).

D.      PSA 9, LLC ("PSA 9") agreed to extend post-petition loans to Debtor on a first priority secured basis on the terms set forth in the Peak Web LLC Loan and Security Agreement and Secured Promissory Notes related thereto ("Litigation Loan Documents") attached hereto as **Exhibit 1**.

E.      Debtor requires financing in order to fund the expenses associated with the Litigation as defined and described in the Motion.  Without such financing, Debtor will be unable to continue its employment of Susman Godfrey LLP and pay the expenses necessary to effectively prosecute and defend the claims asserted in the Litigation, and the value of Debtor's assets will be diminished.  Debtor's ability to maintain and preserve its assets and effect an orderly and efficient reorganization will be seriously jeopardized, to the substantial detriment of creditors, if the requested post-petition financing is not approved.

F.      Debtor determined it is not able to adequately finance the Litigation using cash flow from operations.  Debtor concluded it needs to obtain financing in order to fund the Litigation expenses.

G.      Debtor was unable to obtain adequate financing on equal or more favorable terms than those offered by PSA 9.

H.      Debtor believes the terms and conditions of the financial accommodations provided in the Litigation Loan Documents are fair and equitable, and in the best interests of Debtor's estate.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

I.     An immediate need exists for Debtor to continue receiving credit under the Litigation Loan Documents in order to enable its counsel to properly prepare for and conduct the prosecution and defense of the Litigation in a timely manner pending a final hearing on the Motion and to avoid immediate and irreparable harm to Debtor, its estate, and its creditors.

J.     Any terms not otherwise defined herein shall have the meanings set forth in the Motion.

Based on the foregoing, good cause exists to grant the Motion on an interim basis and to enter this Interim Order; now, therefore,

IT IS HEREBY ORDERED:

1.     _Disposition_.  The Motion is granted and the Litigation Loan Documents are approved in their entirety for the interim period pending further hearing.

2.     _Authorization_.  Debtor is authorized to execute and deliver to PSA 9 the Peak Web LLC Secured Promissory Note Number 2.

3.     _Perform Duties_.  Debtor is authorized to incur indebtedness under the terms of the Litigation Loan Documents and otherwise perform such duties as required or permitted under the terms of the Litigation Loan Documents.

4.     _First Priority Liens_.  PSA 9 is granted, pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority lien upon the Litigation and proceeds thereof with respect to all loans and advances made pursuant to the Litigation Loan Documents.  The Litigation Loans shall be secured by:

a.     Valid, properly perfected, first priority senior liens on the Litigation and the proceeds thereof (the "Collateral") pursuant to Section 364(d)(1) of the Bankruptcy Code, with such liens securing the Litigation Loan obligations to prime and be senior in priority to all existing security interests in and liens on the Collateral;

**Page 3 of 9** -   INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY
SECURED CREDIT AND SETTING FINAL HEARING (LITIGATION LOAN)

b.      The Litigation Loans and other rights and remedies granted under this Interim Order to Litigation Lender shall continue in this Chapter 11 case and in any superseding Chapter 7 case, and such liens and security interests shall maintain their priority as provided in this Interim Order until all the Litigation Loan obligations have been indefeasibly paid in full in cash and completely satisfied, and Litigation Lender's commitments have been terminated in accordance with the Litigation Loan Documents.

5.      <u>Amendments, Consents, Waiver, and Modifications</u>.  Debtor and Litigation Lender may enter into any non-material amendments, consents, waivers, or modifications to the Litigation Loan Documents, in each case without the need for further notice and hearing or any order of this Court; provided, however, that no such amendment or waiver shall increase the amount of Litigation Lender's lending commitment without Court approval.

6.      <u>Term</u>.  All Litigation Loan obligations shall be due and payable, and repaid in full, in cash, on the Maturity Date, which is June 30, 2017.

7.      <u>Adequate Protection for Existing Creditors</u>.  To the extent any Existing Secured Creditors have valid perfected and unavoidable liens on the Collateral, the Existing Secured Creditors are hereby granted, as adequate protection of their respective interests in the Collateral against any diminution in the value of their interests in the collateral resulting from the grant of the Litigation Loan liens, each of the Existing Secured Creditors is hereby granted a continuing valid, binding, enforceable, and perfected post-petition junior lien on the Collateral (the "Adequate Protection Liens").  The Adequate Protection Liens shall be junior in priority to the Litigation Loan and liens, and will have the same validity, enforceability, and relative priorities as the respective pre-petition security interests and liens of the Existing Secured Creditors.

8.      <u>Additional Perfection Measures</u>.  The Litigation Loan liens and the Adequate Protection Liens shall be perfected by operation of law immediately upon entry of this

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Interim Order.  None of Debtor, Litigation Lender, or the Existing Secured Creditors shall be required to enter into or obtain waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien, or similar instruments in any jurisdiction, or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and perfect the Litigation Loan liens or the Adequate Protection Liens.  Debtor may, but is not required to, require any Existing Secured Creditor to sign a subordination agreement reflecting the subordination of their liens to Litigation Lender.

a.      Litigation Lender and the Existing Secured Creditors may, but shall not be obligated to, obtain consents from any party-in-interest, file mortgages, financing statements, notices of lien, or similar instruments, or otherwise record or perfect such security interests and liens, in which case:

(i)      All such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)      No defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted hereunder.

b.      In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien, or similar instruments, Litigation Lender and Existing Secured Creditors may, but shall not be obligated to, file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of Collateral, and such filings by Litigation Lender and the Existing Secured Creditors shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien, or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

9.      <u>Loan Advances</u>.  Proceeds from the Litigation Loan shall be used exclusively for funding the Litigation.

**Page 5 of 9** -   INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY
SECURED CREDIT AND SETTING FINAL HEARING (LITIGATION LOAN)

10.    <u>Successors and Assigns</u>.  The Litigation Loan Documents and the provisions of this Interim Order shall be binding upon Debtor, Litigation Lender, the Existing Secured Creditors, and each of their respective successors and assigns, and shall inure to the benefit of Debtor, Litigation Lender, the Existing Secured Creditors, and each of their respective successors and assigns, including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for Debtor under any chapter of the Bankruptcy Code.

11.    <u>Binding Nature of Agreement</u>.  Each of the Litigation Loan Documents to which Debtor is or will become a party shall constitute legal, valid, and binding obligations of Debtor, enforceable in accordance with their terms.  The Litigation Loan Documents have been or will be property executed and delivered to Litigation Lender by Debtor as soon as is practicable after entry of this Interim Order.  The rights, remedies, powers, privileges, liens, and priorities of Litigation Lender provided for in this Interim Order and in the Litigation Loan Documents shall not be substantially modified, altered, or impaired in any manner by any subsequent order (including a confirmation order) by any plan in this Chapter 11 case, or by the dismissal or conversion of this Chapter 11 case or any superseding Chapter 7 case without the express written consent of Litigation Lender unless and until the Litigation Loan obligations have first been indefeasibly paid in full in cash and completely satisfied, and the commitments terminated in accordance with the Litigation Loan Documents.

12.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to Bankruptcy Code Section 364 and Bankruptcy Rule 4001(c), granting Litigation Lender all protections afforded by Bankruptcy Code Section 364(e).  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (a) the validity of any obligation, indebtedness, or liability incurred hereunder by Debtor to Litigation Lender prior to the date of receipt by Litigation Lender of written notice of

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

the effective date of such action; or (b) the validity and enforceability of any lien or priority authorized or created under this Interim Order or pursuant to the Litigation Loan Documents. Notwithstanding any such reversal, stay, modification, or vacatur, any post-petition indebtedness, obligation, or liability incurred by Debtor to Litigation Lender prior to written notice to Litigation Lender of the effective date of such action shall be governed in all respects by the original provisions of this Interim Order, and Litigation Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the Litigation Loan Documents with respect to all such indebtedness, obligations, or liability.

13. <u>Priming and Subordination of Liens</u>. For avoidance of doubt, and notwithstanding anything to the contrary herein, all liens on the Collateral in existence on the date hereof shall be primed by the Litigation Loan and shall be subordinate to the Litigation Loan liens.

14. <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that Litigation Lender may have to bring or be heard on any matter brought before this Court.

15. <u>No Waiver by Failure to Seek Relief</u>. The failure of Litigation Lender to seek relief or otherwise exercise its rights and remedies under the Interim Order, the Litigation Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights thereunder, or otherwise of Litigation Lender.

16. <u>Limits on Litigation Lender's Liability</u>. Nothing in this Interim Order or in any of the Litigation Loan Documents, or any other documents related to this transaction, shall in any way be construed or interpreted to impose or allow the imposition upon Litigation Lender of any liability for any claims arising from any and all activities by Debtor in the operation of its business, conduct of the Litigation, or in connection with its restructuring efforts.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

17. <u>No Third Party Beneficiary</u>.  No rights are created hereunder for the benefit of any third party, any creditors, or any direct, indirect, or incidental beneficiary.

18. <u>Survival</u>.  Except as otherwise provided herein (a) the protections afforded to Litigation Lender and the Existing Security Creditors under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of any order (i) dismissing this Chapter 11 case; or (ii) converting this Chapter 11 case to a case under Chapter 7; and (b) the Litigation Loan liens and the Adequate Protection Liens shall continue in this Chapter 11 case, in any superseding Chapter 7 case, or after any such dismissal.  Except as otherwise provided herein, the Litigation Loan liens and the Adequate Protection Liens shall maintain their priorities as provided in this Interim Order and in the Final Order, and shall not be modified, altered, or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by Litigation Lender in accordance with the Final Order), or any conversion of this Chapter 11 case to a case under Chapter 7, or dismissal of the Chapter 11 case, or by any other act or omission until all Litigation Loan obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the Litigation Loan Documents are terminated in accordance therewith.

19. <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

20. <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order and/or the Litigation Loan Documents.

21. <u>Binding Effect of Interim Order</u>.  The terms of this Interim Order shall be binding on any trustee appointed under Chapter 7 or Chapter 11 in this case.

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

IT IS FURTHER ORDERED that a final hearing on the Motion shall be held by the Court in Courtroom __ of the United States Bankruptcy Court for the District of Oregon, 1001 SW Fifth Avenue, Portland, Oregon 97204, on _____, 2016 at _____ _.m., or as soon thereafter as counsel may be heard. Within three business days after the entry hereof, Debtor shall mail or otherwise serve a copy of this Order, together with a notice of the final hearing, pursuant to LBR 4001-1.D and LBF 541.

# # #

Presented by:

TONKON TORP LLP


By _____
    Timothy J. Conway, OSB No. 851752
    Ava L. Schoen, OSB No. 044072
    888 S.W. Fifth Avenue, Suite 1600
    Portland, OR 97204-2099
    Telephone:    503-221-1440
    Facsimile:    503-274-8779
    E-mail:    tim.conway@tonkon.com
                ava.schoen@tonkon.com
    Attorneys for Debtor

cc:    List of Interested Parties

**Page 9 of 9** - INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN FIRST PRIORITY SECURED CREDIT AND SETTING FINAL HEARING (LITIGATION LOAN)

**TONKON TORP** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 16-32311-pcm11    Doc 14    Filed 06/13/16

# EXHIBIT 1

# PEAK WEB LLC LOAN AND SECURITY AGREEMENT

This Peak Web LLC Loan and Security Agreement (this "Agreement") is made as of June 10, 2016 (the "Effective Date") by Peak Web LLC, a California limited liability company, dba Peak Hosting (the "Debtor"), in favor of PSA 9, LLC, a Nevada limited liability company ("Secured Party"). Jeffrey Papen is a party to this Agreement for purpose of making personal covenants and guarantees as set forth herein. All capitalized but undefined terms shall have the meanings set forth in Exhibit A attached hereto (the "Definitions").

## RECITALS

WHEREAS, Debtor lacks the financial wherewithal to wage effectively the prosecution of its claims against Machine Zone, Inc., a Delaware corporation ("Machine Zone"), relating to the pending case Peak Web, LLC v. Machine Zone, Inc., et al., No. 1-15-cv-288681 (Cal Sup. Ct. Santa Clara Cty.) and any related action, as well as the defense claims asserted against Debtor by Machine Zone in Machine Zone, Inc. v. Peak Web, LLC, No. 1-15-cv-288498 (Cal Sup. Ct. Santa Clara Cty.) and any related actions (collectively, the "Litigations")

WHEREAS, the Debtor and Secured Party believe Debtor's positions in the Litigations are meritorious, and that Machine Zone's position in the Litigation are frivolous and without merit.

WHEREAS, the Secured Party is willing to provide up to One Million Five Hundred Thousand Dollars ($1,500,000) (or higher if the actual costs of the Litigation are higher) of funding to Debtor to cover the costs and expenses of prosecuting efficiently the Litigations in the form of loans secured by the proceeds of the Litigations, all according to the term but subject to the conditions and limitations set forth in this Agreement.

WHEREAS, the Secured Party will fund: (1) Fifty Thousand Dollars ($50,000) pursuant to a Secured Promissory Note Number 1 substantially in the form attached hereto as Exhibit B; (2) One Hundred Fifty Thousand Dollars ($150,000) on or before June 30, 2016 pursuant to Secured Promissory Note Number 2, substantially in the form attached hereto as Exhibit C (each a "Note," and together, the "Notes"); and (3) and additional sums up to One Million Five Hundred Thousand Dollars ($1,500,000), as Secured Party deems necessary or appropriate.

WHEREAS, Each of the Debtor and the Secured Party intends that the Debtor's Obligations shall be secured by the Collateral, all according to the terms, but subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises and the agreements, provisions and covenants herein contained, Debtor and the Secured Party hereby agree as follows:

## AGREEMENT

In consideration of the issuance of the Notes by Debtor and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor and the Secured Party (each a "Party" and together the "Parties") hereby agree as follows:

1. **Grant of Security Interest.** Debtor hereby grants to the Secured Party a perfected, first-position security interest (the "Security Interest") and continuing lien on all of Debtor's right, title, and interest in, to, and under the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located: (i) all cash and currency received as a result of the Litigations; (ii) Insurance proceeds received as a result of the Litigations; (iii) General Intangibles to the extent of the Litigations; (iv) to the extent not otherwise included above, all Collateral Support and Supporting Obligations relating to any of the foregoing; (v) the right to conduct and control the Litigations; and (vi) to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing in each case, including after-acquired Collateral (collectively, the "Collateral").

Exhibit 1
Page 1 of 15

Case 16-32311-pcm11    Doc 14    Filed 06/13/16

2. **Representations and Warranties.** The Debtor hereby represents and warrants to the Secured Party that:

    (a)   **Valid Security Interest.** The Security Interest granted pursuant to this Agreement will constitute a valid and continuing, perfected first-position security interest in favor of the Secured Party in the Collateral for which perfection is governed by the UCC, or filing with the United States Copyright Office or United States Patent and Trademark Office.

    (b)   **Location and Name of Debtor.** Debtor's place of business is located at 19363 Willamette Drive, Mailbox #498, West Linn, OR 97069. Debtor's legal name is as set forth in the first paragraph of this Agreement.

    (c)   **No Liens.** The Collateral is free and clear of any liens or encumbrances and Debtor or its subsidiaries is the owner of the Collateral (or, in the case of after-acquired Collateral, at the time Debtor or its subsidiaries acquires rights in the Collateral, will be the owner thereof) or any such liens shall be subordinated to the liens of Secured Party.

3. **Covenants.** The Debtor covenants with Secured Party as follows:

    (a)   **Negative Covenants.** Debtor will not, without the prior express written consent of the Secured Party:

      (i)   settle, compromise, dispose of, make any other offer to settle or compromise, or otherwise dispose of the Litigations;

      (ii)   change its litigation counsel handling the Litigations;

      (iii)   make any material strategic tactical decision, motion, or action affecting the Litigations;

      (iv)   breach, amend, or terminate Debtor's obligations to its litigation counsel pursuant to the engagement letter between Debtor and its litigation counsel;

      (v)   fail to keep Secured Party and its counsel appraised and informed in real time as to developments in the Litigations;

      (vi)   assign or transfer the Litigation to any third party or surrender or allow decision-making control over the Litigation to any third party (including to a receiver or bankruptcy trustee); or

      (vii)   take any action, nor permit any of its officers and directors to take any action, that may impact the Litigations in a material adverse manner.

    (b)   **Affirmative Covenants.** Debtor will:

      (i)   keep Secured party and its counsel appraised and informed in real time as to the developments and required decisions relating to the Litigations; and

      (ii)   discharge its obligations to its litigation counsel, as outlined in the engagement letter between Debtor and its litigation counsel, in connection with the Litigations; and

      (iii)   take all necessary or appropriate actions to support the successful prosecution of the Litigations.

    (c)   **"Bad Boy" Guarantee.** Jeffrey Papen hereby covenants to the Secured Party that he will take all actions necessary or desirable to support the Debtor's and Secured Party's interests in the Litigations, including but not limited to:

      (i)   providing all necessary or desirable support to litigation counsel;

      (ii)   testifying if needed in the Litigations;

      (iii)   helping with discovery requests in connection with the Litigations;

      (iv)   keeping Secured Party and its counsel appraised and informed in real time with respect to the Litigations;

(v) avoiding taking any action or omission reasonably likely to have a material adverse effect on the Debtor's or Secured Party's interests in the Litigations.

Jeffrey Papen hereby acknowledges and agrees that he will be personally liable to Secured Party for Debtor's Obligations pursuant to the Notes if he breaches any of his covenants herein or if Debtor breaches any of its covenants to Secured Party made herein or pursuant to the Notes.

**(d)** **Other Covenants of the Debtor.** Debtor hereby covenants to Secured Party that it shall:

(i) **Information Rights.** As soon as practicable, provide Secured Party access to its unaudited monthly financial statements (income statement, balance sheet, and statement of cash flow).

(ii) **Inspection Rights.** Allow Secured Party, at its own expense, to (a) inspect the Debtor's properties, books, and records for a bona fide proper purpose, and (b) discuss the Debtor's affairs, finances, and accounts with members of the Debtor's Board, so long as in each case: (i) such inspections and discussions are upon reasonable and advance notice to the Debtor and during the Debtor's normal working hours, and are not unduly burdensome to the Debtor; and (ii) the inspecting Secured Party sign the Debtor's standard form of confidentiality agreement.

**(e)** **Further Documentation.** The Debtor agrees to cooperate with the Secured Party in connection with any filings reasonably necessary to perfect the Secured Party's rights granted herein. At any time and from time to time, upon the written request of the Secured Party, and at the sole expense of the Debtor, the Debtor will promptly and duly authenticate and deliver such further instruments and documents and take such further action as the Secured Party may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, filing any financing or continuation statements under the UCC in effect with respect to the liens created herein. The Debtor also hereby authorizes the Secured Party to file any such financing or continuation statement without the authentication of the Debtor to the extent permitted by applicable law. A reproduction of this Agreement shall be sufficient as a financing statement (or as an exhibit to a financing statement on form UCC-1) for filing in any jurisdiction.

**(f)** **Compliance with Laws, etc.** The Debtor will comply in all material respects with all laws, rules, regulations, and orders of any governmental authority applicable to any part of the Collateral; *provided, however,* that the Debtor may contest any such law, rule, regulation, or order in any reasonable manner which does not, in the reasonable opinion of the Debtor, adversely affect the Secured Party's rights or the priority of its liens on the Collateral.

**(g)** **Limitations on Dispositions of Collateral.** The Debtor will not sell, transfer, lease, license, assign or otherwise dispose of any of the Collateral, or attempt, offer, or contract to do so without the consent of the Secured Party, nor will Debtor surrender or allow any decision-making control over the Litigations to any receiver or bankruptcy trustee or any third party without the prior express written consent of the Secured Party.

**(h)** **No Liens.** Other than in connection with the Permitted Liens, Debtor will keep the Collateral free and clear of any liens or encumbrances until Debtor has satisfied all of the Obligations.

**(i)** **Taxes and Liens**. Debtor shall pay promptly when due all taxes and other governmental charges, all Liens and all other charges now or hereafter imposed upon or affecting any Collateral.

(j)     **Principal Place of Business**.  Debtor shall not, without written prior consent of the Secured Party, (i) change Debtor's name or place of business (or, if Debtor has more than one place of business, its chief executive office), or the office in which Debtor's records relating to accounts receivable and payment intangibles are kept or (ii) change Debtor's state of organization.

4.     **Event of Default.**  The occurrence of any Events of Default (as defined in the Notes) shall constitute a default hereunder and under the Notes.

5.     **Remedies.**  In the event of a default hereunder, Secured Party shall have all remedies provided under the Notes and by law, including but not limited to all remedies provided by Article 9 of the UCC. Regardless of where any Collateral or the books and records are located, the Secured Party may require Debtor to assemble all Collateral and the books and records in one or more locations and make such Collateral and the books and records available to the Secured Party.  The Secured party in its sole discretion, may, with or without notice, upon filing suit to enforce or preserve its rights under this Agreement or at any time while such a suit is pending, apply for and secure the appointment of a receiver to take possession of Debtor's business or the Collateral and the income, rents and proceeds therefrom.  Debtor hereby expressly waives any requirement that the Secured Party or the receiver post a bond upon the appointment of such receiver.  All the rights, privileges, power and remedies of the Secured Party shall be cumulative.

6.     **Waivers and Amendments.**  No waiver or amendment by either Party of any of the terms or conditions of this Agreement shall be effective unless in a writing signed by both Parties.  No waiver or indulgence by the Secured Party as to any required performance or of any default by Debtor shall constitute a waiver as to any subsequent required performance, default or other obligation of Debtor.  Any valid waiver or amendment shall be binding upon the Parties and their respective successors and assigns.

7.     **Termination of Security Interest.**  Upon satisfaction of the Obligations pursuant to the Notes, the Security Interest shall automatically terminate and all rights to the Collateral shall revert to the Debtor. Upon any such termination, the Secured Party shall authenticate and deliver to the Debtor such documents as the Debtor may reasonably request to evidence such termination.

8.     **Miscellaneous.**

(a)     **Transfer, Successors, and Assigns**.  The terms and conditions of this Agreement shall be binding upon the Debtor and its successors and assigns, as well as all persons who become bound as a debtor to this Agreement and inure to the benefit of the Secured Party and their successors and assigns.  Nothing in this Agreement, express or implied, is intended to confer upon any Party other than the Parties or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  To the extent Debtor sells and issues further Notes, each such new purchaser shall become party hereto as a "Secured Party" solely upon execution of a signature page to this Agreement or other joinder agreement and only with Secured Party's express written consent.

(b)     **Governing Law.**  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the Parties shall be governed, construed, and interpreted in accordance with the laws of the State of Washington, without giving effect to principles of conflicts of law.

(c)     **Counterparts.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute one (1) instrument.

(d)     **Titles and Subtitles.**  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(e)     **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when emailed with confirmed receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, if such notice is addressed to the party to be notified at such Party's address or facsimile number as set forth below or as subsequently modified by written notice.

(f)     **Severability.**  If one (1) or more provisions of this Agreement are held to be unenforceable under applicable law, the Parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each Party as close as possible to that under the provision rendered unenforceable.  In the event that the Parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded, and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)     **Expenses.**  Debtor shall pay on demand all reasonable fees and expenses, including attorneys' fees and expenses, accounting fees and expenses, and advisory fees and expenses, incurred by the Secured Party in connection with the negotiation, preparation, and execution of this Agreement and the Notes, and in connection with custody, preservation or sale of, or other realization on, any of the Collateral or the enforcement or attempt to enforce any of the Obligations which is not performed as and when required by this Agreement.

(h)     **Entire Agreement.**  This Agreement, and the documents referred to herein constitute the entire agreement between the Parties pertaining to the subject matter hereof, and any and all other written or oral agreements existing between the Parties concerning such subject matter are expressly canceled.

*[Signature Page Follows]*

The Debtor and Secured Party have caused this Peak Web LLC Security Agreement to be duly executed and delivered as of the Effective Date.

**"DEBTOR:"**

**PEAK WEB LLC,**
a California limited liability company,
dba Peak Web Holding

By: *Jeffrey Papen*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
9C3C148498DD4C1...
Printed Name: Jeffrey Papen
Title:   Chief Executive Officer

Address:      19363 Willamette Drive
              Mailbox #498
              West Linn, OR 97069

**"SECURED PARTY:"**

**PSA 9, LLC**

By: *Joyce Chang*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
B14BF7B0072445F...
Joyce Change Hsu, Manager

**"JEFFREY PAPEN:"**

By: *Jeffrey Papen*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
9C3C148498DD4C1...
Jeffrey Papen, an individual

**[Signature Page to Peak Web, LLC Security Agreement]**

# EXHIBIT A

## DEFINITIONS

"Accounts" shall mean all "accounts" as defined in the UCC.

"Chattel Paper" shall mean all "chattel paper' as defined in the UCC.

"Collateral Support" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Copyright Licenses" shall mean any and all agreements providing for the granting of any right in or to Copyrights (whether Debtor is licensee or licensor thereunder).

"Copyrights" shall mean all United States, state and foreign copyrights, whether registered or unregistered, now or hereafter in force throughout the world, all registrations and applications therefor, all rights corresponding thereto throughout the world, all extensions and renewals of any thereof, the right to sue for past, present and future infringements of any of the foregoing, and all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Deposit Accounts" shall mean "deposit accounts" as defined in the UCC.

"Equipment" shall mean: (i) all "equipment" as defined in the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether characterized as equipment under the UCC) and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"Event of Default" shall mean any Event of Default as defined in the Notes.

"General Intangibles" (i) shall mean all "general intangibles" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all tax refunds, all licenses, permits, concessions and authorizations and all Intellectual Property (in each case, regardless of whether characterized as general intangibles under the UCC).

"Goods" (i) shall mean all "goods" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all Inventory and Equipment and any computer program embedded in the goods and any supporting information provided in connection with such program if (x) the program is associated with the goods in such a manner that is customarily considered part of the goods or (y) by becoming the owner of the goods, a Person acquires a right to use the program in connection with the goods (in each case, regardless of whether characterized as goods under the UCC).

"Instruments" shall mean "instruments" as defined in the UCC.

"Insurance" shall mean: (i) all insurance policies covering any or all of the Collateral (regardless of whether the Secured Party is the loss payee thereof) and (ii) any key man life insurance policies.

"Intellectual Property" shall mean, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses and, without limitation, all software code and software scripts.

"Inventory" shall mean: (i) all "inventory" as defined in the UCC and (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Debtor's business; and all goods which are returned to or repossessed by any Debtor, all computer programs embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"Liens" means any lien, security interest, mortgage, pledge, hypothecation, assignment, encumbrance, claim or interest of any kind or nature.

"Obligations" means all obligations, whether direct or indirect, joint or several, absolute or contingent or now or hereafter existing, or due or to become due, of Debtor to the Secured Party under this Agreement, the Notes, or any other related loan document, including any extensions, replacements, modifications, substitutions, amendments and renewals of the same, whether for principal, interest, fees, expenses or otherwise.

"Patent Licenses" shall mean all agreements providing for the granting of any right in or to Patents (whether Debtor is licensee or licensor thereunder).

"Patents" shall mean all United States, state and foreign patents and applications for letters patent throughout the world, all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations of any of the foregoing, all rights corresponding hereto throughout the world, and all proceeds of the foregoing including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit and the right to sue for past, present and future infringements of any of the foregoing.

"Proceeds" shall mean: (i) all "proceeds" as defined in Article 9 of the UCC, and (ii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Receivables" shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument General Intangible, together with all of Debtor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"Receivables Records" shall mean (i) all original copies of all documents, instruments or other writings or electronic records or other records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of Debtor or any computer bureau or Secured Party from time to time acting for Debtor or otherwise, and (iii) all other written or non-written forms of information related in any way to the foregoing or any Receivable.

"Securities Account" shall mean "securities account" as defined in the UCC.

"Supporting Obligations" shall mean "supporting obligations" as defined in the UCC.

"Trademark Licenses" shall mean any and all agreements providing for the granting of any right in or to Trademarks (whether Debtor is licensee or licensor thereunder).

"Trademarks" shall mean all United States, state and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, trade styles, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing, all extensions or renewals of any of the foregoing, all of the goodwill of the business connected with the use of and symbolized by the foregoing, the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Trade Secret Licenses" shall mean any and all payments providing for the granting of any right in or to Trade Secrets (whether Debtor is licensee or licensor thereunder).

"Trade Secrets" shall mean all trade secrets and all other confidential or proprietary information and know-how now or hereafter owned or used in, or contemplated at any time for use in, the business of Debtor (all of the foregoing being collectively called a "Trade Secret"), whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, the right to sue for past, present and future infringement of any Trade Secret, and all proceeds of the foregoing, including, without limitation, licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Washington or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

**PEAK WEB LLC**

**SECURED PROMISSORY NOTE NUMBER 1**

$50,000.00                                                                                                    June 10, 2016

   **FOR VALUE RECEIVED**, Peak Web LLC, a California limited liability company, dba Peak Hosting (the "Company"), promises to pay to PSA 9, LLC, a Nevada limited liability company (the "Holder"), or its registered assigns, in lawful money of the United States of America, the principal sum of U.S. Fifty Thousand Dollars ($50,000.00), or such lesser amount as shall equal the outstanding principal amount hereof, together with (i) interest from the date of this note (this "Note") on the unpaid principal balance at a rate equal to fifteen percent (15.0%) interest per annum (compounded monthly), computed on the basis of the actual number of days elapsed and a year of 365 days; and (ii) all Costs (as defined below). All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earliest to occur of the following: (i) the date of any settlement, disposition, sale, transfer, or assignment (or assignment of decision-making control over the Litigations) to any third party (including but not limited to a receiver or bankruptcy trustee) of the Litigations (as defined in the Security Agreement); and (ii) April 1, 2017 (the "Maturity Date"). Any capitalized terms not defined herein will have the meaning ascribed to them in that certain Peak Web LLC Loan and Security Agreement, dated as of June 10, 2016 (the "Security Agreement").

   The following is a statement of the rights of Holder and the conditions to which this Note is subject, and to which Holder, by the acceptance of this Note, agrees:

   1.   **No Prepayment.** The Company may not prepay this Note in whole or in part without the consent of the Holder. All payments of interest and principal shall be in lawful money of the United States of America. All payments shall be applied first to Costs (as defined below), then to accrued but unpaid interest, and thereafter to principal.

   2.   **Events of Default.** Any of the following shall constitute an event of default (each an "Event of Default"): (i) the Company does not timely pay the amounts due and payable hereunder; (ii) the Company fails to observe or perform any covenants set forth in this Note or in the Security Agreement and such observance or performance is not cured within five (5) business days of the Company's receipt of written notice of such failure; (iii) the Company breaches any representation or warranty made in this Note or the Security Agreement and such breach is not cured, if curable, within five (5) business days of the Company's receipt of written notice of such failure; (iv) upon the commission of any act of bankruptcy by the Company, the execution by the Company of a general assignment for the benefit of creditors, the filing by or against the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act, or the continuation of such petition without dismissal for a period of ninety (90) days or more, or the appointment of a receiver or trustee to take possession of the property or assets of the Company, or decision-making control of the Litigations; or (v) the Company initiates a liquidation event. Upon each and every Event of Default under clauses (i), (ii), (iii) or (v) above, and at any time thereafter during the continuance of such Event of Default, the Holder may, subject to the Security Agreement, by written notice to the Company, declare that any or all of the principal amount of this Note, and any or all accrued but unpaid interest hereon, shall be immediately due and payable. Upon each and every Event of Default under clause (iv) above, and at any time thereafter during the continuance of such Event of Default, immediately and without notice, all of the principal amount of this Note, and any or all accrued but unpaid interest hereon, shall be immediately due and payable. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, Holder may exercise any other right power or remedy granted to it by the Security Agreement) or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

   3.   **Successors and Assigns.** The rights and obligations of the Company and Holder shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

4. **Waiver and Amendment.** Any provision of this Note may be amended, waived, or modified only upon the written consent of the Company and the Holder. Any amendment or waiver effected in accordance with this Section shall being binding upon the Company, Holder, and any transferees of the Note. The Company and all endorsers of this Note hereby waive notice, presentment, protest and notice of dishonor.

5. **Assignment by the Company**. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Holder.

6. **Notices**. Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient when emailed with confirmed receipt, when delivered personally or by a nationally-recognized delivery service (such as Federal Express or UPS), or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

7. **Statutory Notice**. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FOREBEAR FROM ENFORCING REPAYMENT OF DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

8. **Security Interest**. This Note is secured by a lien on all the Collateral as defined in the Security Agreement.

9. **Expenses**. The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including but not limited to reasonable attorneys' fees and legal expenses, accounting fees and expenses, and advisor fees and expenses, incurred by the Holder in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs"). The Company agrees that any delay on the part of the Holder in exercising any rights hereunder will not operate as a waiver of such rights.

10. **Entire Agreement**. This Note and the Security Agreement constitute the entire agreement and understanding of Holder and Company relating to the subject matter set forth herein and therein, and supersede any and all previous agreements or understanding between Holder and Company relating to the subject matter set forth in this Note and the Security Agreement.

11. **Governing Law**. This Note and all acts and transactions pursuant hereto and the rights and obligations of Holder and Company shall be governed, construed, and interpreted in accordance with the laws of the State of Washington, without giving effect to principles of conflicts of law.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Company has caused this Note to be issued as of the date first written above.

**"COMPANY:"**

**PEAK WEB LLC,**
a California limited liability company,
dba Peak Hosting

By: _Jeffrey Papen_ _____
Name: Jeffrey Papen
Its: CEO


AGREED TO AND ACCEPTED THIS 10th DAY OF JUNE,
2016

**"HOLDER:"**

**PSA 9, LLC,**
a Nevada limited liability company

By: _Joyce Chang_ _____
Name: Joyce Chang Hsu
Its: Manager

4848-0797-8034, v. 3

Exhibit 1
Page 12 of 15
Case 16-32311-pcm11    Doc 14    Filed 06/13/16

**PEAK WEB LLC**

**SECURED PROMISSORY NOTE NUMBER 2**

$150,000.00                                                                              June __, 2016

   **FOR VALUE RECEIVED**, Peak Web LLC, a California limited liability company, dba Peak Hosting (the "Company"), promises to pay to PSA 9, LLC, a Nevada limited liability company (the "Holder"), or its registered assigns, in lawful money of the United States of America, the principal sum of U.S. One Hundred Fifty Thousand Dollars ($150,000.00), or such lesser amount as shall equal the outstanding principal amount hereof, together with (i) interest from the date of this note (this "Note") on the unpaid principal balance at a rate equal to fifteen percent (15.0%) interest per annum (compounded monthly), computed on the basis of the actual number of days elapsed and a year of 365 days; and (ii) all Costs (as defined below). All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the earliest to occur of the following: (i) the date of any settlement, disposition, sale, transfer, or assignment (or assignment of decision-making control over the Litigations) to any third party (including but not limited to a receiver or bankruptcy trustee) of the Litigations (as defined in the Security Agreement); and (ii) April 1, 2017 (the "Maturity Date"). Any capitalized terms not defined herein will have the meaning ascribed to them in that certain Peak Web LLC Loan and Security Agreement, dated as of June 10, 2016 (the "Security Agreement").

   The following is a statement of the rights of Holder and the conditions to which this Note is subject, and to which Holder, by the acceptance of this Note, agrees:

   1.   **No Prepayment**. The Company may not prepay this Note in whole or in part without the consent of the Holder. All payments of interest and principal shall be in lawful money of the United States of America. All payments shall be applied first to Costs (as defined below), then to accrued but unpaid interest, and thereafter to principal.

   2.   **Events of Default**. Any of the following shall constitute an event of default (each an "Event of Default"): (i) the Company does not timely pay the amounts due and payable hereunder; (ii) the Company fails to observe or perform any covenants set forth in this Note or in the Security Agreement and such observance or performance is not cured within five (5) business days of the Company's receipt of written notice of such failure; (iii) the Company breaches any representation or warranty made in this Note or the Security Agreement and such breach is not cured, if curable, within five (5) business days of the Company's receipt of written notice of such failure; (iv) upon the commission of any act of bankruptcy by the Company, the execution by the Company of a general assignment for the benefit of creditors, the filing by or against the Company of a petition in bankruptcy or any petition for relief under the federal bankruptcy act, or the continuation of such petition without dismissal for a period of ninety (90) days or more, or the appointment of a receiver or trustee to take possession of the property or assets of the Company, or decision-making control of the Litigations; or (v) the Company initiates a liquidation event. Upon each and every Event of Default under clauses (i), (ii), (iii) or (v) above, and at any time thereafter during the continuance of such Event of Default, the Holder may, subject to the Security Agreement, by written notice to the Company, declare that any or all of the principal amount of this Note, and any or all accrued but unpaid interest hereon, shall be immediately due and payable. Upon each and every Event of Default under clause (iv) above, and at any time thereafter during the continuance of such Event of Default, immediately and without notice, all of the principal amount of this Note, and any or all accrued but unpaid interest hereon, shall be immediately due and payable. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, Holder may exercise any other right power or remedy granted to it by the Security Agreement) or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

   3.   **Successors and Assigns.** The rights and obligations of the Company and Holder shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

Exhibit 1
Page 13 of 15

Case 16-32311-pcm11    Doc 14    Filed 06/13/16

4.     **Waiver and Amendment.**  Any provision of this Note may be amended, waived, or modified only upon the written consent of the Company and the Holder. Any amendment or waiver effected in accordance with this Section shall being binding upon the Company, Holder, and any transferees of the Note.  The Company and all endorsers of this Note hereby waive notice, presentment, protest and notice of dishonor.

5.     **Assignment by the Company**.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of Holder.

6.     **Notices**.  Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient when emailed with confirmed receipt, when delivered personally or by a nationally-recognized delivery service (such as Federal Express or UPS), or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, addressed to the party to be notified at such party's address as set forth below or as subsequently modified by written notice.

7.     **Statutory Notice**.  ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FOREBEAR FROM ENFORCING REPAYMENT OF DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

8.     **Security Interest**.  This Note is secured by a lien on all the Collateral as defined in the Security Agreement.

9.     **Expenses**.  The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including but not limited to reasonable attorneys' fees and legal expenses, accounting fees and expenses, and advisor fees and expenses, incurred by the Holder in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs").  The Company agrees that any delay on the part of the Holder in exercising any rights hereunder will not operate as a waiver of such rights.

10.    **Entire Agreement**.  This Note and the Security Agreement constitute the entire agreement and understanding of Holder and Company relating to the subject matter set forth herein and therein, and supersede any and all previous agreements or understanding between Holder and Company relating to the subject matter set forth in this Note and the Security Agreement.

11.    **Governing Law**.  This Note and all acts and transactions pursuant hereto and the rights and obligations of Holder and Company shall be governed, construed, and interpreted in accordance with the laws of the State of Washington, without giving effect to principles of conflicts of law.

*[Signature page follows]*

Exhibit 1
Page 14 of 15

Case 16-32311-pcm11     Doc 14     Filed 06/13/16

**IN WITNESS WHEREOF**, the Company has caused this Note to be issued as of the date first written above.

           **"COMPANY:"**

           **PEAK WEB LLC,**
           a California limited liability company,
           dba Peak Hosting

           By: _____
           Name:  Jeffrey Papen
           Its:  CEO

           AGREED TO AND ACCEPTED THIS 30th DAY OF JUNE, 2016

           **"HOLDER:"**

           **PSA 9, LLC,**
           a Nevada limited liability company

           By: _____
           Name:  Joyce Chang Hsu
           Its:  Manager

Exhibit 1
Page 15 of 15

Case 16-32311-pcm11    Doc 14    Filed 06/13/16